UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 MAY -1 AM 11: 30

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, **ex rel.** **BRENDAN DELANEY,** | Case No. 2:15cv95 |
| | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** |
| **Plaintiff,** | |
| **vs.** | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| **ECLINICALWORKS,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff-Relator Brendan Delaney, through his attorneys, on behalf of the United States

of America (the "Government" or the "Federal Government"), for his Complaint against

defendant eClinicalWorks ("eCW or "Defendant") alleges based upon personal knowledge,

relevant documents, and information and belief, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false and/or fraudulent records, statements and claims made and

caused to be made by Defendant and/or its agents and employees, in violation of the federal

False Claims Act, 31 U.S.C. §§ 3729 et seq. ("the FCA").

2.    This action seeks to recover millions of federal dollars spent to purchase and

subsidize the purchase and implementation of defective Electronic Health Record ("EHR")

systems sold by eCW to healthcare providers in Vermont and across the United States.  An EHR

system -- sometimes also referred to as an Electronic Medical Record ("EMR") system -- allows

healthcare providers to record patient information electronically instead of using paper records.

It is intended to provide a complete replacement for the patient's paper medical chart.

3.    Since 2009, the Federal Government has spent billions of dollars in "stimulus"

1

funding under the American Recovery and Reinvestment Act ("ARRA"), as well as other federal funding, to advance the adoption and meaningful use of electronic health records systems throughout the United States.

4.     Under the ARRA, the Federal Government provides EHR Incentive Payments to eligible healthcare professionals and institutions that purchase an electronic health record system that complies with "Meaningful Use" ("MU") requirements established by the United States Department of Health and Human Services ("HHS").

5.     eCW is one of the largest suppliers of EHR systems in the United States. Many healthcare professionals and institutions in Vermont and throughout the United States have purchased and implemented eCW's EHR system.

6.     This action alleges that eCW has falsely represented to customers that its EHR system complies with federal Meaningful Use requirements, while concealing fundamental defects with the system. These hidden defects not only violate material conditions of the EHR Incentive Payment program but also create a significant risk to patient health and safety.

7.     Among its most significant flaws, eCW's EHR system fails reliably (1) to document and display the medications administered to patients, and (2) to report the results of laboratory tests -- features that are fundamental to a reliable medical record system. As a result of these failings, the eCW system fails to comply with the core requirements for Meaningful Use to qualify for federal incentive payments.

8.     Corporate managers at eCW have been aware of the significant flaws in the EHR system since at least 2010, and likely earlier. Despite this knowledge, eCW has misrepresented to purchasers who are recipients of federal funding that its EHR system complies with MU requirements and concealed from purchasers the significant defects in the system. Moreover,

2

despite numerous "upgrades" to its EHR system, Relator is informed and believes that eCW has consistently failed to fix the system's flaws.

9.     eCW has a financial disincentive to fix its EHR system.  A fix would require not just addressing the problems in the core of the software but in virtually all of eCW's modules sold nationwide.  Admitting that the eCW software is defective would put eCW at a severe competitive disadvantage in the competitive EHR marketplace.

10.     The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010.  Congress amended the FCA in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the Government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

11.     The FCA prohibits, inter alia: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. §§3729(a)(1)(A), (B).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. §3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. §2461 note; Public Law 104-410]).

12.     In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or

3

not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . . . " 31 U.S.C. §3729(b)(2).

13.     The FCA allows any person having information about an FCA violation to bring an action for himself and the Government, and to share in any recovery.  The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

14.     Based on the foregoing laws, *qui tam* plaintiff Brendan Delaney seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendant's misconduct has extended.

## II.     PARTIES

15.     Plaintiff/Relator Brendan Delaney ("Relator") is a resident of Rock Tavern, New York.  He is an experienced project manager with expertise in the field of electronic health records systems.  Between 2010 and 2014, he worked as a project manager or consultant for several institutions that implemented eCW's electronic health records system.   These work assignments included:

a.     From April 2010 through August 2011, Relator was as an Implementation Specialist with the New York City Division of Health Care Access and Improvement, and in that position worked on the implementation of eCW's EHR system at the Rikers Island jail complex in New York City.

b. From September 2011 to October 2012, Relator worked as a senior consultant

4

for Arcadia Solutions and in that position consulted with the following healthcare providers among others concerning their implementation of eCW's EHR system: Beth Israel - Phillips Ambulatory Care Facility and Beth Israel Medical Group in New York City; Mount Sinai - University Medical Practice Associates in New York City; St. Luke's-Roosevelt Hospital Center and St. Luke's Division of Nephrology & Critical Care in New York City; and several ambulatory clinics in New York City's high schools.   In addition during this same time period, Relator worked at the Arcadia Solutions Service Desk troubleshooting problems with eCW's EHR system encountered by dozens of medical facilities serviced by the Arcadia Solutions Service Desk in Chelmsford, Massachusetts.

c.  From September 2013 through March 2014, Relator worked as a consultant for HSM Consulting in Quincy, Massachusetts, and in that position consulted with the following healthcare providers among others concerning their implementation of eCW's EHR system:  Anna Jaques Hospital in Newburyport, MA; Atlantic Surgical Associates in Newburyport, MA; North Shore Internal Medicine Clinic, in Newburyport, MA; Northeast Endocrinology & Diabetes Center in Newburyport, MA; and Southcoast Hospital in Fairhaven, Massachusetts.

Relator is currently a project manager for UnitedHealth Group, a diversified healthcare company. He brings this action on behalf of the United States of America, the real party in interest.

16.    Defendant eClinicalWorks is a privately held electronic health records company headquartered at 2 Technology Drive, Westborough, Massachusetts.  eCW states on its website that its EHR products are used by "more than 100,000+ physicians and 600,000+ users across all 50 states with revenues for 2013 exceeding $290 million."  Several Vermont healthcare

providers have purchased eCW's EHR products, including but not limited to: White River Family Practice in White River Junction, Vermont; Little Rivers Health Care in Wells River, East Corinth, and Bradford, Vermont; and Community Health Services of the Lamoille Valley (which includes several healthcare centers in Vermont).

## III.   JURISDICTION AND VENUE

17.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although the issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

18.   Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Before filing this action, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based. Additionally, Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to his claims.

19.   This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States. Moreover, the Defendant can be found in and/or transacts or has transacted business in the District of Vermont.

6

20.     Venue is proper in the District of Vermont pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendant can be found in and/or transacts or has transacted business in this district, and because violations of 31 U.S.C. §§ 3729 *et seq.* alleged herein occurred within this district.  At all times relevant to this Complaint, Defendant regularly conducted substantial business within this district and/or made significant sales within this district.

## IV.     THE FEDERAL EHR INCENTIVE PROGRAM

### A.     The "Meaningful Use" Requirement

21.     The Health Information Technology for Economic and Clinical Health ("HITECH") Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 (ARRA) (Pub. L. 111-5), was enacted on February 17, 2009.  The HITECH Act amended the Public Health Service Act ("PHSA") and established "Title XXX – Health Information Technology and Quality" to improve health care quality, safety and efficiency through the promotion of health information technology ("HIT") and the electronic exchange of health information.

22.     On December 30, 2009, the Secretary of HHS published an interim final rule setting forth an initial set of standards, implementation specifications, and certification criteria that EHR technology must meet in order for users to be entitled to receive Government financial incentive payments.

23.     Congress tied the HHS standards, implementation specifications, and certification criteria to the incentives available under the Medicare and Medicaid EHR Incentive Programs by requiring the "Meaningful Use" of EHR Technology.

24.     Through HITECH, the Federal Government has committed unprecedented

resources, up to $27 billion over 10 years, to supporting the adoption and use of EHRs.

HITECH's goal is not adoption alone, however, but meaningful use of EHRs.  Thus, the statute

specifically ties payments to providers to the achievement of advances in health care processes

and outcomes.  Eligible professionals who demonstrate meaningful use of certified EHR

technology can receive up to $43,720 over five continuous years from the Medicare EHR

Incentive Program and up to $63,750 over six years from the Medicaid EHR Incentive Program.

Through the EHR Incentive Programs, eligible hospitals, including critical access hospitals

(CAHs), can qualify for EHR incentive payments beginning with a $2 million base payment.

25.     The objective of the HITECH Act is to provide reimbursement support for

eligible medical providers, including institutional providers that are able to demonstrate

meaningful use of EHR technology.  As such, Congress intended to ensure that EHR programs

supported by federal funding provide certain capabilities and that those capabilities are

implemented in accordance with adopted standards and implementation specifications.  In other

words, to qualify for federal funding, EHR programs must meet certain defined standards.

26.     The ARRA identified three objectives for EHR meaningful use:  (1) use of EHR

in a meaningful manner; (2) use of certified EHR technologies for electronic exchange of health

information to improve quality of care; and (3) use of certified EHR technology to achieve

clinical quality measures (CQM) and other measures selected by CMS.

27.     On July 28, 2010, the federal Centers for Medicare and Medicaid Services

("CMS") finalized and published the Initial Set of Standards, Implementation Specifications, and

Certification Criteria for EHR Technology as well as Meaningful Use standards for the first

"Stage" of EHR implementation for purposes of the federal incentive programs and stimulus

grant monies.

28.     Meaningful Use standards are to be implemented in stages. Stage 1 set forth the meaningful use objectives and measures for the first two reporting years, 2011 and 2012, and focused on objectives including electronically capturing health information in a coded format, facilitating disease and medication management, and reporting clinical quality measures.

29.     On September 4, 2012, CMS published the Stage 2 final rule, which expanded on the Stage 1 criteria and focused on the next step after the foundation of data capture in Stage 1, namely, the exchange of essential health data among health care providers and patients to improve care coordination. On March 30, 2015, CMS published proposed rules for Stage 3. Once finalized the Stage 3 rules will focus on using EHR systems to improve quality, safety and efficacy of health care, including promoting patient access to self management tools and improving population health.

30.     Regardless of the year the medical provider starts its EHR program, the first two years are governed by the Stage 1 Meaningful Use criteria and do not move onto the more rigorous Stage 2 criteria until the third year of participation.

31.     To qualify for incentive payments and subsidies from the federal government, all users of ERH must satisfy the Stage 1 Meaningful Use criteria.

32.     The Stage 1 Meaningful Use regulations, codified at 42 C.F.R. §§ 495.6(d) & (e), set the basic requirements that eligible professionals and eligible hospitals must meet in order to receive Medicare and Medicaid Incentive payments for the purchase and implementation of EHR technology. The Meaningful Use Stage 1 objectives are split into two groups:

- **Core Objectives** – The EHR system must satisfy all of these 15 objectives in order to fulfill the Meaningful Use requirements.

- **Menu Set Objectives** - The EHR system must satisfy 5 out of these 10 objectives in order to fulfill the Meaningful Use requirements

33.     Of particular relevance to this Complaint are the following Core and Menu Objectives that an EHR system must satisfy in order to fulfill the Meaningful Use requirements:

- maintenance of an active medication list that allows a user to electronically record, modify and retrieve a patient's active medication list as well as medication history (42 C.F.R. §§ 495.6(d)(5)(i), a Core Objective);

- ability to perform drug-drug and drug-allergy interaction checks, and notification of the user at the point of care (42 C.F.R. §§ 495.6(d)(2)(i), a Core Objective);

- ability to computerize provider order entry, which allows a user to electronically record, store, retrieve and modify orders for medication, laboratory testing, and radiology/imaging (42 C.F.R. §§ 495.6(d)(1)(i), a Core Objective);

- ability to complete medication reconciliation of two or more medication lists by comparing and merging into a single medication list (42 C.F.R. §§ 495.6(e)(7)(i), a Menu Objective); and

- ability to electronically receive clinical laboratory test results in a structured format and display such results in human readable format (42 C.F.R. §§ 495.6(e)(2)(i), a Menu Objective).

34.     To qualify to receive an EHR incentive payment from the Government, providers must attest to demonstrating meaningful use each year that the provider applies for the payment. As part of the attestation process, CMS requires each eligible professional and eligible hospital to confirm that it is using an EHR that is certified specifically for the EHR Incentive Program.

35.     The Office of the National Coordinator for Health Information Technology

10

(ONC) Certification Program provides a defined process for certifying EHR technologies.

36.     In collaboration with ONC, the National Institute of Standards and Technology (NIST) has developed the functional and conformance testing requirements, test cases, and test tools to support the health IT certification programs.  The purpose of the conformance test methods is to ensure that the EHR system offers the necessary technological capability to meet the Meaningful Use criteria.

37.     Even if the EHR system receives certifications under the ONC Certification Program, the EHR system must meet Meaningful Use standards *in its operation* in each place of business to qualify providers for EHR incentive payments.

38.     During the time period covered by this Complaint, eCW's EHR system was certified as a qualifying EHR technology for purposes of the EHR Incentive Program under the American Recovery and Reinvestment Act.

39.     This Complaint alleges that notwithstanding the certification it received, eCW knew that its EHR system in operation did not meet Meaningful Use requirements of federal law, that eCW concealed the failure to meet Meaningful Use requirements from purchasers, and that eCW knowingly caused providers falsely to attest to compliance with Meaningful Use standards in support of claims for federal EHR incentive payments.

40.     Under the FCA, these claims constitute false and fraudulent claims, and the providers' attestations of compliance with Meaningful Use standards in support of these claims constitute false and fraudulent statements material to the false claims, all in violation of the FCA.

**B.     eCW Represents That Its EHR Technology Complies with Federal Meaningful Use Requirements**

41.     eCW represents to the provider community that its EHR technology satisfies each of the Meaningful Use Stage 1 requirements and, therefore, that users of its technology are

eligible to receive EHR incentive payments from the Federal Government.

42.    For example, eCW's website states that its EHR software "provides all of the features needed for qualifying to receive Meaningful Use reimbursement for Stage 1, Stage 2 and beyond." [Available at http://www.eclinicalworks.com/resources/meaningful-use/; last accessed on 4/10/15].

43.    eCW disseminates a "Meaningful Use Training Scenarios Guide" that provides, at p. 13, the following question and answer:

> **Does eCW guarantee meeting requirements of Meaningful Use?**
> eClinicalWorks guarantees that our software will meet the Meaningful Use criteria as defined through ARRA, thereby reducing the risk that practices face in investing in new technology.

This eCW manual, published in 2011, is available at various locations on the internet, *e.g.*, http://www.nycreach.org/reach_wiki/images/5/56/Meaningful_Use_Training_Scenarios_Guide_February_2011.pdf

44.    On its website, eCW explains how its EHR system fulfills each of the Stage 1 Meaningful Use Core Objectives. eCW lists each Core Objective and then, for each objective, purports to answer the question, "How does eClinicalWorks fulfill this requirement?" For example:

a.    With regard to the Meaningful Use requirement that an EHR system "Maintain the patient's active medication list," eCW's website states that "eClinicalWorks fulfill[s] this requirement" in the following manner: "eClinicalWorks maintains an active patient medication list and allows a provider to manage all patient medications for optimum continuity of care. The Right Panel [of the computer screen] provides a functional display of the patient's current medication list for every encounter." [Available at: http://www3.eclinicalworks.com/knowledge-center-meaningful-use-stage-

one-criteria-core-objectives-active-medication-list.htm; last accessed on 4/10/15.]
Essentially the Right Panel should replicate the list of medication in the patient's progress
note, but, as explained below, in many instances it does not.

      b.    With regard to the Meaningful Use requirement that the EHR system
allow "Computerized physician order entry (CPOE) of medications," eCW's website
states that its EHR product "fulfill[s] this requirement" in the following way:
"eClinicalWorks provides the ability to order medications through our Treatment window
in the Progress Note, Order Sets, eCliniSense, and Templates. These medications can
then be e-prescribed, faxed, or printed through eClinicalWorks." [Available at:
http://www3.eclinicalworks.com/knowledge-center-meaningful-use-stage-one-criteria-
core-objectives-cpoe.htm; last accessed on 4/10/15.]

      c.    With regard to the Meaningful Use requirement that the EHR system
provide "Drug-drug and drug-allergy interaction checks," eCW's website states that
"eClinicalWorks fulfill[s] this requirement" in the following manner: "Drug-to-Drug and
Drug-to-Allergy checks are performed real time at the time of prescribing based upon the
patient's current medications and medication allergy list. In addition, the system also
checks for any drug-disease contraindications." [Available at:
http://www3.eclinicalworks.com/knowledge-center-meaningful-use-stage-one-criteria-
core-objectives-allergy-interaction-checks.htm; last accessed on 4/10/15 .]

      d.  With regard to the Meaningful Use requirement that the EHR system
"Document Lab Test Results," eCW's website states that its EHR system fulfills this
requirement in the following manner: "Through the Lab Results window, all lab results
can be captured in a structured manner. . . . Increased efficiencies can be experienced in

capturing the results of labs through our uni-directional and bi-directional lab interfaces with national and local lab partners." [Available at:

http://www3.eclinicalworks.com/knowledge-center-meaningful-use-stage-one-criteria-menu-set-objectives-document-test-results.htm; last accessed on 4/10/15.]

45.     eCW also offers an online Webinar training session called "Becoming a Meaningful User" conducted by eCW staff. According to eCW's website, during this training, eCW's Webinar team explains to the user "[h]ow eCW meets the objectives of Meaningful Use." [http://support.eclinicalworks.com/training/docs/mu.pdf; last accessed on 4/20/15.]

46.     The above are just a small sample of the many representations that eCW has made to the provider community that its EHR products meet federal Meaningful Use requirements.

## V.     ALLEGATIONS

### A.     Relator's Background

47.     Relator is a project management professional who specializes in the field of electronic health records systems. Relator has worked as a project manager or consultant with several healthcare providers – individual practices, small clinics, as well as large institutions -- that implemented eCW's electronic health records system. These providers, and the time frame that Relator worked with them in regard to their use of eCW's EHR system, are listed in the chart below:

| Medical Facility | Type of Facility | Medical Specialty | Location | Dates Worked on eCW issues |
|---|---|---|---|---|
| Robert N. Davoren Center (RNDC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| George Motchan Detention Center (GMDC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| Eric M. Taylor Center (EMTC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| Anna M. Kross Center (AMKC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| Rose M. Singer Center (RMSC) | Ambulatory Clinic/ | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |

14

| Otis Bantum Correctional Center (OBCC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
|---|---|---|---|---|
| George R. Vierno Center (GRVC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| West Facility - Contagious Disease Unit (WFC) | Ambulatory Clinic/ Inpatient | Multi-Specialty | Queens, NY | Apr 2010 - Aug 2011 |
| Manhattan Detention Complex (MDC) | Ambulatory Clinic | General Medicine | Manhattan | Apr 2010 - Aug 2011 |
| Vernon C. Bain Center (VCBC) | Ambulatory Clinic | General Medicine | Bronx, NY | Apr 2010 - Aug 2011 |
| James A. Thomas Center (JATC) | Ambulatory Clinic | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| North Infirmary Command (NIC) | Inpatient | General Medicine | Queens, NY | Apr 2010 - Aug 2011 |
| **Continuum Health Partners** | | | | |
| Beth Israel - Phillips Ambulatory Care Facility | Ambulatory Clinic | Oncology Pediatric Surgery Breast Surgery | Union Square, NYC | Sep 2011 - Oct 2012 |
| Beth Israel Medical Group | Ambulatory Clinic | Cardiology | 34th Street, NYC | Sep 2011 - Oct 2012 |
| Beth Israel Medical Group | Ambulatory Clinic | Gastrointestinal | 35th Street, NYC | Sep 2011 - Oct 2012 |
| Beth Israel Medical Group | Ambulatory Clinic | Ophthalmology | 36th Street, NYC | Sep 2011 - Oct 2012 |
| Beth Israel Medical Group | Ambulatory Clinic | Orthopedic | 37th Street, NYC | Sep 2011 - Oct 2012 |
| Mount Sinai - University Medical Practice | Ambulatory Clinic | Cardiology | West 59th St., NYC | Sep 2011 - Oct 2012 |
| St. Luke's-Roosevelt Hospital Center - | Ambulatory Clinic | Breast Surgery | West 59th St., NYC | Sep 2011 - Oct 2012 |
| Beth Israel - Phillips Ambulatory Care | Ambulatory Clinic | Gastrointestinal | Union Square, NYC | Sep 2011 - Oct 2012 |
| Beth Israel - Phillips Ambulatory Care | Ambulatory Clinic | Orthopedics | Union Square, NYC | Sep 2011 - Oct 2012 |
| Beth Israel - General Medical Associates | Ambulatory Clinic | General Medicine | West 57th St., NYC | Sep 2011 - Oct 2012 |
| Beth Israel - Hand Surgery Center | Ambulatory Clinic | Hand Surgery | East 34th St., NYC | Sep 2011 - Oct 2012 |
| St. Luke's Division of Nephrology & Critical Care | Ambulatory Clinic | Vascular Transplant Renal (Nephrology) | Amsterdam Ave, NYC | Sep 2011 - Oct 2012 |
| **NYC Based Clinics** | | | | |
| A. Philip Randolph High School | Ambulatory Clinic | General Medicine | West 135th St., NYC | Sep 2011 - Oct 2012 |
| Louis D. Brandeis High School | Ambulatory Clinic | General Medicine | West 84th St., NYC | Sep 2011 - Oct 2012 |
| Martin Luther King High School | Ambulatory Clinic | General Medicine | Amsterdam Ave, | Sep 2011 - Oct 2012 |
| **eClinicalWorks Service Desk** | | | | |
| Serving Boston Area Hospitals | Ambulatory Clinic | General Medicine | New England Area | Sep 2011 - Oct 2012 |
| **Community Health Care** | | | | |
| Anna Jaques Hospital | Ambulatory Clinic | General Medicine | Newburyport, MA | Sep 2013 - Nov 2013 |
| Atlantic Surgical Associates | Ambulatory Clinic | General Medicine | Newburyport, MA | Sep 2013 - Nov 2013 |
| North Shore Internal Medicine | Ambulatory Clinic | General Medicine | Newburyport, MA | Sep 2013 - Nov 2013 |
| Northeast Endocrinology & Diabetes Center | Ambulatory Clinic | General Medicine | Newburyport, MA | Sep 2013 - Nov 2013 |
| Women's Health Care | Ambulatory Clinic | General Medicine Endocrinology | Newburyport, MA | Sep 2013 - Nov 2013 |
| Southcoast Hospital | Ambulatory Clinic | General & Specialty Medicine | Fairhaven, MA | Nov 2013 - Mar 2014 |

48. In each setting, Relator witnessed significant flaws in eCW's EHR system that rendered the system fundamentally unreliable and unable to meet Meaningful Use standards. These defects also posed a risk to patient health and safety,

49. Because Relator observed the same flaws repeatedly throughout the facilities that used eCW's EHR system, Relator is informed and believes, and therefore alleges, that the defects are embedded in the software and render eCW's EHR technology noncompliant with

15

Meaningful Use requirements in all of the facilities that use eCW's technology.

50.     These defects, and how Relator discovered them, are explained more fully below.

**B.     How Relator First Learned of The Defects in ECW's EHR System**

51.     Relator first learned of the defects in eCW's electronic health records system in 2010 while working as an Implementation Specialist with the New York City Division of Health Care Access and Improvement, Correctional Health Services, in New York City.

52.     New York City received over $20 million in federal "stimulus" funds in 2010 under ARRA to purchase and implement an EHR system for its correctional facility at Rikers Island, a complex with an annual inmate population of over 100,000 (hereafter "Rikers Island"). Prior to the receipt of the stimulus funds, Rikers Island had a small pilot project using eCW's EHR system; however, the stimulus funds allowed Rikers Island to extend the EHR system to the entire jail complex.

53.     New York City entered into a contract with eClinicalWorks for the implementation of its EHR system throughout the Rikers Island complex, initially in the female jail in the complex (the Rose M. Singer Center), and later the remaining jails. The eCW contract was for $27,713,333 through December 31, 2010 with an anticipated extension through December 31, 2014 at a cost of $14,308,390.

54.     As an Implementation Specialist for New York City, Relator was tasked with the implementation of the rollout of eCW's EHR system at Rikers Island.  After the initial implementation of eCW's EHR system in the female jail in November 2008, it became apparent to Relator as well as to officials at Rikers Island by 2010, that eCW's EHR software was significantly flawed, since physicians and others operating the software were unable to generate any type of accurate Current Medication Report.

16

55.    The purpose of an EHR system is to function as the complete patient medical record, replacing the paper chart. Maintaining a current list of the patient's medications is an essential component of a medical record. Through an EHR system, a provider must have the ability to order medication, print the medication order, and display the patients' current medication as well as the patients' medication history.

56.    eCW knew that the EHR system at Rikers Island was intended to replace the paper chart system entirely and that there would be no backup system to accurately track the patients' medication.

57.    As early as April 2010, key implementation specialists and others charged with working with the EHR system in the jails, including the Rikers pharmacist Thomas Hayden and Development Specialist Erika Sheridan, raised their concerns about the systemic failures of the EHR system to record medications given to inmates.

58.    New York City's Department of Health and Mental Hygiene ("NYC DOHMH") notified eCW of the problems and tried to persuade eCW to correct the flaws in the EHR system that prohibited the Current Medication section of the patient's record from displaying the correct medication.

59.    eCW refused to make any corrections to the software and proceeded with the implementation of the software in the male jails before the second cycle of corrections and modifications were complete, thereby putting inmates at risk.

60.    This was Relator's initial, but by no means last, exposure to defects in eCW's EHR technology.

61.    As Relator continued to work on the rollout of the EHR system at Rikers Island, and as he subsequently worked with eCW's EHR system at several other healthcare facilities,

17

Relator discovered that the problems were not limited to the failure to generate accurate Current

Medication Reports and that the same fundamental problems were present in every provider

setting that used eCW's EHR system. These systemic problems are described in greater detail

below.

62.     Although eCW has released several versions of its EHR software, Relator is

informed and believes that the fundamental flaws described herein exist in each version of the

software and render the technology unreliable, dangerous, and non-compliant with Meaningful

Use requirements.

## C.     eCW's EHR System Fails to Document and Display Several Pieces of Critical Medical Information

### 1.     eCW's EHR System Fails Reliably To Document and Track Medications Administered to Patients

a.     Failure to Keep Accurate Record of Current Medications

63.     One of the most significant defects that Relator discovered in eCW's electronic

health records system, in virtually every setting in which Relator witnessed the system in

operation, is its inability to reliably document and track medications administered to patients.

Relator witnessed many examples of this defect.

64.     For example, Helpdesk tickets at Rikers Island revealed many instances in which

eCW's EHR system did not accurately record current medications, such as:

> a.     A doctor at Rikers Island concluded that patient E.B. should not be taking
>
> Advair, discontinued his use of the drug, and ordered a Q-Var prescription
>
> instead, all within the eCW system. However, when the patient's record was
>
> pulled up later, the right panel of the screen showed the Advair prescription as
>
> current and made no indication that the patient was on Q-Var. [Rikers Helpdesk

18

Ticket No. 1150991, June 10, 2010].

b.      The medical record for another Riker's inmate did not display his current

HIV medications.   [Rikers Helpdesk Ticket No. 735589, January 19, 2009].

c.      The medical record for another Riker's inmate did not display his

Methadone taper.   [Rikers Helpdesk Ticket No. 894664, August 7, 2009.]

65.      The flaw in eCWs software that caused an inaccurate record of a patient's

medication to display in the patient's electronic chart persisted well into 2011 and 2012 at Rikers

Island, after eCW claimed that the issue was "resolved."   *See, e.g.*, Rikers Helpdesk Ticket no.

1022589 (1/15/10), no. 1241833 (10/14/10), no.1288146 (11/3/10); and no. 1392406 (2/6/11).

66.      The inability of eCW's EHR system to display accurately and reliably the

patient's Current Medication List was observed by Relator at the other institutions where he

consulted on eCW EHR issues, including Beth Israel - Phillips Ambulatory Care Facility and

Beth Israel Medical Group in New York City; Mount Sinai - University Medical Practice

Associates in New York City;  St. Luke's-Roosevelt Hospital Center and St. Luke's Division of

Nephrology & Critical Care in New York City; several ambulatory clinics in New York City's

high schools; Boston Children's Hospital and several other medical facilities serviced by the

Arcadia Solutions Service Desk in Chelmsford, Massachusetts; Anna Jaques Hospital in

Newburyport, MA; Atlantic Surgical Associates in Newburyport, MA; North Shore Internal

Medicine Clinic, in Newburyport, MA; Northeast Endocrinology & Diabetes Center in

Newburyport, MA; and Southcoast Hospital in Fairhaven, Massachusetts.

67.      For example, on July 19, 2012, Relator received an email from Dr. Steven

Smith, a nephrologist practicing at St. Luke's-Roosevelt Hospital in New York City, which

uses eCW's EHR system.  Dr. Smith reported that medications that were ordered for a

19

patient, and modifications to prescription orders, did not show up in the patient's electronic record. Notably, Dr. Smith observed that the eCW medication module presents "a serious patient safety issue. eCW does not change and properly document/track medication changes."

68.     Similarly, while Relator was working at the Arcadia Solutions Service Desk in Chelmsford, Massachusetts – a Helpdesk for addressing EHR problems – between September 2011 and October 2012, he learned of many examples of eCW's EHR system not properly documenting and tracking medications. For example, on December 21, 2011, a physician at the Pediatric Medical Clinic in Chelsea, Massachusetts reported that eCW's EHR system displayed two patients' medications in the same chart. Relator encountered many similar examples while working at the Service Desk.

b.     Incorrect Patient Record Displayed

69.     eCW's EHR technology also regularly causes one patient's record to be pulled up and visible in the overview pane, while the accompanying progress note displays the information for an entirely different patient.

70.     Dr. Brenda Harris, the physician at Rikers Island who initially identified this error, reported in May 2011 that the software defect nearly caused her to forward a diagnosis intended for the patient described in the right panel to the patient described in the left panel. A less cautious and observant provider could easily make that mistake, risking serious patient harm.

71.     Likewise, Relator found that at Boston Children's Hospital, eCW's software regularly displayed the incorrect patient's information, and even caused prescriptions to be ordered for the wrong patient. For example, Dr. Sonya Stevens, a physician at Boston Children's

20

Hospital reported to Relator that, on an almost daily basis, she pulled up a patient record and the eCW software caused the system to display two different patients' information in the different sections of the same screen. On at least one occasion, November 18, 2011, this resulted in the system sending a prescription to the pharmacy for the wrong patient. Fortunately, Dr. Stevens caught the software's error and was able to contact the pharmacy with the correction, but were it not for her cautious observation, a prescription would have been given to the wrong child.

72.     Relator experienced this problem at virtually all of the facilities where he worked, listed in ¶ 47 above.

c.     Failure to Log Start and Stop Dates of Medication

73.     The eCW EHR system also fails to log, or incorrectly logs, the start and stop dates of medication, causing various medication errors. Both start and stop dates should be logged automatically. A medication that is recorded without a stop date will remain listed under a patient's "Current Medication" indefinitely, even where the ordering physician or other provider has specified a "Duration" (e.g., "10 days") for the order.

74.     To document his concerns regarding blank or inaccurate start and stop dates in the electronic medical records at Rikers Island, Relator created two Excel report files downloaded from the eCW system at Rikers Island.

75.     The first file showed Medication Orders With Invalid Start Dates from 01-01-2011 through 04-23-2011. There were literally thousands of files from eCW's system with invalid start dates, each one of which could lead to an overdose or a failure to prescribe a needed medication. Relator also created a separate spreadsheet for the year 2010 documenting 30,000 records with invalid start dates for medication orders.

76.     The second file showed Medication Orders With Blank Start or Stop Dates from

21

01-01-2011 through 04-23-2011. It documented thousands of Rikers Island files in eCW's EHR system with blank start and stop dates, the ramifications of which included potential overdosing or neglecting to prescribe a needed medication.

77.    The·eCW "Informed Prescribing Users Guide" specifically states that "[t]he stop date is automatically calculated by the difference between the start date and the duration of the prescription, and is populated by default." (See Exhibit 19). However, in practice, even when physicians follow eCW's instructions, the system often leaves the Stop Date field for a prescription empty.

78.    Relator experienced the unreliability of eCW's EHR system in recording stop and start dates for medication at virtually all of the facilities where he worked, listed in ¶ 47 above.

d.    Failure to Document Previous Medications

79.    The eCW system is further flawed in that the medications a patient may have taken in the past are not consistently loaded into the "Current Medication" section of the record, only the "Complaint" section, which may not be checked by providers or the system itself when medication is being prescribed.

80.    Relator experienced this problem at virtually all of the facilities where he worked, listed in ¶ 47 above.

81.    This failure to appropriately record medications can lead to serious patient harm, because the system will not identify potential hazards associated with the past medication, such as risk factors for a diagnosis or contraindications for other prescriptions.

e.    Inability to Accommodate More than One Dosage

82.    eCW's EHR system does not reliably accommodate orders where prescribed dosages vary over time; therefore, the data is not accurate with respect to those medications.

22

This happens when, for example, a medication is to be administered twice a day at two different dosages or when a medication, such as methadone or steroids, is to decrease in dosage over several days. This is particularly a serious problem in prison settings given that prison clinics typically administer many doses of methadone each day to inmates.

83.     Additionally, on at least one occasion at Rikers Island, on October 10, 2009, the eCW system doubled the dosage of a medication ordered by the attending physician. The physician directed the patient to take the medication twice a day, yet the system recorded that the medication should be taken four times a day.

84.     Other physicians have experienced the eCW system replacing a physician's order for a branded medication with the generic. ·Although the active ingredients are the same in a branded drug and its generic, there can still be risks associated with substituting a generic medication without physician approval. For example, patients with hypothyroidism, a population that is often sensitive to very small changes in a medication's dosage, have been warned against making changes to their brand of medication without first discussing the benefits, risk and outcomes with their doctors.

f.      Telephone Encounter Flaws

85.     The Telephone Encounter system, which was used extensively across all Rikers facilities, contained serious defects when ordering, re-ordering, or discontinuing medications. Any time a medication was stopped or re-ordered over eCW's Telephone Encounter system, the directive did not show in the right pane of the computer screen.

g.      Multiple Appointments Override

86.     When patients have multiple appointments in one day, but are seen out of order, eCW's EHR system does not reliably record medications in the correct sequence in which they

23

are prescribed.  For example, if an appointment is scheduled as last in a day, but occurs first, that visit's medication record is stored in the system until the end of the day, even if a follow-up appointment later in the day resulted in a change to the medication order.  Thus, the system treats the appointment time as more important than the actual time of the encounter.  As such, encounters may be documented out of sequence and orders made during the encounters may be read in the wrong sequence, resulting in incorrect prescription information.  The only way to correct the problem when an appointment occurs out of order, is to manually shift the appointment times to reflect the order in which the appointments actually occurred, which is contrary to the fundamental reason for having an automated EHR system.

87.     The multiple appointments defect becomes particularly problematic through the incorporation of the Telephone Encounter system, as it is not uncommon for a physician to submit a telephone encounter on the same day as an appointment.  System generated telephone encounters are identified by the time the Telephone Encounter was created; thus, an order placed via a Telephone Encounter created after an appointment occurs, but before the appointment was scheduled to occur, will be overridden by any conflicting orders entered with the appointment.  This failure to process a correction to a medication order can result in a patient receiving the wrong medication, and/or not receiving the medication he or she needs.

### 2.     eCW's EHR System Fails Reliably to Record and Track Laboratory Results

88.     eCW represents that its EHR technology allows providers to order medical laboratory tests electronically and that the laboratory results will be included in the patient's electronic chart.  However, in Relator's experience, eCW's EHR system in operation does *not* reliably record and track laboratory results.

89.     The procedure for ordering laboratory tests using eCW's EHR system is, first, to

24

place the Lab Order electronically in the patient chart. The order specifies the patient's name and date of birth, the type of test, and the order date, among other information. The order generates a unique numeric number that identifies that exact order against the patient's demographic data. The Lab results return electronically via the eCW Lab Interface and should automatically populate the patient chart; however, a number of flaws in the EHR system result in the Lab results not populating the patient chart.

90.     For example, at the Rikers Island jail complex, eCW set up within the EHR system a Lab Interface with BioReference, through which providers could order medical laboratory tests for inmates. However, the interface was completely ineffective. As of July 2011, approximately 1,884 labs had been sent to BioReference through the eCW system for which the results had never been received. This number underrepresented the extent of the problem as many of the labs that were received would not have been received if providers had not gone outside the eCW system to obtain the results.

91.     Relator encountered many similar examples of the failure of eCW's EHR system to record and track lab results at the other facilities where Relator worked on EHR issues, listed in ¶ 47 above.

92.     For example, when Relator worked as an EHR consultant at Southcoast Hospital in Fairhaven Massachusetts, from November 2013 through March 2014, he was tasked with analyzing and reconciling a massive backlog of Lab Tests ordered by attending physicians for their patients.

93.     During the course of analyzing the backlog of test results at Southcoast Hospital, Relator encountered tens of thousands of Lab results left pending in the system, unassigned to any patient record, that were processed by the Meditech system via the eCW Lab Interface.

25

These Lab test results never made it into the correct individual patient charts. This caused serious concern for the medical providers treating patients because they were unaware that the Lab results were pending in the system unless they spent hours looking for them. Treatment of chronically ill patients was compromised by this flaw in eCW's EHR, which prevented a physician from taking timely and corrective action in developing a treatment plan for a patient based on Lab results.

94.     At Southcoast Hospital Relator found the following five categories of Lab-related errors in the EHR system, all of which are indicative of fundamental flaws in eCW's Lab interface:

a.      Unique Specimen Number Not Found.  In this category of error, the Lab results were returned without the unique numeric patient identifier and therefore failed to populate the Patient Chart; hence they remained pending in the Lab Interface Queue until they were manually reconciled much later.

b.      Exception Occurred During Processing.  In this category, the Lab results were returned with the name of the Lab Order transposed, e.g. from "T4 Free" to "Free T4"; consequently the Lab result did not match the Lab Test ordered and did not make it into the Patient Chart.

c.      Patient Match Not Found.  In this category, the Lab results were returned with the Patient's Name missing from the Lab Order and remained mismatched and not placed in the correct patient's record.

d.      Latest Copy of Laboratory Result Not Found on the System.  In this category, the Lab results were returned with all the parameters in place, yet inexplicably failed to attach to the Patient Chart.

26

e.     Test Not Found In Dictionary.  In this category of error, the Lab results

were returned with all the parameters in place, yet failed to attach to the Patient Chart as a

result of an outdated compendium of Lab Orders in the eCW database that did not

recognize the type of Lab test performed.

95.     As a consequence of all of these flaws in eCW's Lab Interface, Lab results do not

reliably make it into the patient's electronic chart, which seriously compromises patient

treatment and safety.

**D.     eCW's EHR System Does Not Contain Adequate Protections Against Abuse**

**1.     Inadequate Protections to Retain a Record of Prescriptions.**

96.     eCW's EHR system does not contain sufficient security protections to ensure that

a record of prescriptions is maintained within the system.  Prescriptions can be printed without

being logged, and can be deleted permanently after being logged.

97.     The eCW technology produces a "Prescription Print" pdf document of the

prescription when it is sent to the printer. However, the image merely captures a copy of the

prescription.  Accordingly, a provider can have a prescription filled with the pharmacy and then

delete *all* records including the progress note while it is still unlocked.

98.     This flaw leaves the system wide open for abuse, as users can easily create a

prescription order in the system, print it, and then delete it without leaving evidence of the

prescription order in the electronic system.  This can be done with prescriptions for all types of

medication, including narcotic drugs.

99.     In addition, the EHR system does not display individual medication orders

when multiple medications orders are placed together.

100.    Because the software program cannot register multiple simultaneous entries by

27

different providers, and because providers can permanently delete prescription orders even after printing them, over-prescription and under-prescription can occur both purposefully and by accident.

101.   Relator observed that certain providers have abused the system's flaws by giving out more drugs than lawful, and then deleting orders. For example one New York City Department of Health and Mental Hygiene employee, Ariel Ludwig, reported to Relator on or about April 17, 2010 that she was aware of a sick call patient at Rikers Island that had overdosed on psychiatric medications. The patient appeared to have been given a "stat order" which, in addition to the medications he had already taken, became a dangerous combination. Ms. Ludwig checked the medication log and discovered that the "stat order" had been deleted in the system.

### 2.   Inadequate Protections Against Overmedication

102.   eCW's system is further flawed in that it does not contain adequate protections against overmedicating and other risks to patients' health. Although the software prevents a second order of the same brand medication to be filled, it permits a physician to order one prescription for a brand medication, and a second medication for its generic equivalent. Relator witnessed this happen in October 2011 at Beth Israel Medical Center in New York City. This flaw creates a significant risk that a physician who is not familiar with a branded drug's generic equivalent could order a second, unnecessary prescription.

103.   At the Rikers Island jail complex, Dr. Arthur Pellowe (Supervising Psychiatrist), Thomas Hayden (Chief Pharmacist), and Dr. Emmanual Cruz (Resident) all expressed concern to Relator over this inadequate protection.

104.   Additionally, on at least one occasion the eCW system documented a text message sent by a patient through the system's "patient portal," as though it was created by a

physician. This happened to a patient of Dr. Heena Banker of Waltham, Massachusetts in December 2011. This vulnerability in the system essentially permits a patient to create an entry in his or her medical record.

### 3. The eCW Software Does Not Automatically Lock Notes.

105.    When notes by physicians in a patient's medical record are not locked, another person can later enter the system and edit the notes. The failure to lock notes is primarily an issue of human error, but the dangers can easily be eliminated by the software if it were programmed to automatically lock notes as soon as a physician closes the current note or opens another note. Under the current eCW software, however, any note left unlocked stays unlocked.

106.    Relator ran a report at the Rikers jail complex and discovered that from 01-01-2010 through 07-17-2011 one jail had over 63,000 unlocked notes and another jail had in excess of 100,000.

107.    Another related problem is that the eCW software allows anyone to create, modify, and delete the patient's "Problem List," which houses the Patient's Diagnosis on the Right Pane of the screen. Providers depend on the Problem List to guide them in determining what medication to order, and the course of treatment they plan. Thus, changes to the list can result in patients receiving medications that are incompatible with their medical histories and potentially dangerous. In addition, the inability of eCW's software to ensure the integrity of the patient's "Problem List" renders it non-compliant with the Meaningful Use Stage 1 Core Objective that requires the EHR system to "Maintain an up-to-date problem list of current active diagnoses." 42 C.F.R. § 495.6(d)(3)(i).

### E. The Flaws in eCW's EHR System Have Been Brought to eCW's Attention Numerous Times, but the Company Continues to Sell the System Without Fixing the Flaws

108. At every location where Relator worked or consulted on the implementation of eCW's EHR system, complaints were made to eCW regarding flaws of the type described in this Complaint.

109. For example, several officials within DOHMH expressed significant concern to eCW concerning flaws in the EHR system implemented at the Rikers Island jail complex. The complaining officials included Dr. Homer Venters, Assistant Commissioner for Correctional Health Services; Danielle Petrocelli, DOHMH Director of Pharmacy; Jeffrey Herrera, Director of Application Integration and Infrastructure; Thomas Langer, Clinical Specialist; and Dr. Kalimulina, Corizon employee. Dr. Venters and Tom Hayden both proposed using the MYSIS (PHS System) for processing medication orders.

110. Erika Sheridan, the NYC DOHMH Development Specialist, also confirmed critical software flaws with the system implemented at Rikers, including the following: (i) the failure to maintain an accurate history of prescribed medications, resulting in over-medication and under-medication of patients; (ii) the failure to record critical information from medication orders resulting in inaccurate data in certain patients' charts; (iii) the failure to build in safeguards to ensure that prescribed medication was processed through the appropriate pharmacy, resulting in inmates being released without critical medication and ensuing injury; and (iv) the failure to prevent prescriptions that were processed and given to patients from being removed from the system, leaving no record of the medication order, and resulting in inaccurate records and an inability to track accountability.

111. Ms. Sheridan brought these problems to the attention of eCW officials and eCW personnel responded that users had to be trained "not" to take certain actions in order for the system to function properly.

30

112.    The problems with eCW's EHR system led to actual patient harm because of medication mismanagement at Rikers Island. In August 2010, the head pharmacist, Mr. Thomas Hayden, reported that he found eCW printed medication orders that were filled by the pharmacy and subsequently given to the inmates that were not recorded in the eCW patient chart.

113.    Dr. Hayden, Director of Pharmacy, informed Relator as well as eCW that there was no way to determine in the eCW system whether a prescription was legitimately ordered or not because the system did not lock progress notes, even where prescription orders had been made.

114.    In the numerous other facilities where Relator worked with eCW's EHR system – listed in ¶ 47 above – many Helpdesk Tickets and complaints were submitted to eCW concerning the flaws described in this Complaint. Given the consistency and similarities of the problems reported to eCW, it was apparent to Relator, and would have been apparent to any reasonable person, that the flaws were inherent in the software and not due to user error.

115.    Despite knowing of these serious flaws in its EHR system, eCW continued to conceal from purchasers its failure to comply with Meaningful Use requirements and has continued to sell its flawed EHR system to hundreds of other customers, many of whom have sought federal subsidies.

## F.    eCW Has Knowingly Caused The Submission Of False Or Fraudulent Claims For EHR Incentive Payments To The Government

116.    eCW knowingly misrepresented to customers in Vermont and throughout the nation that its EHR products satisfied federal Meaningful Use requirements. These misrepresentations foreseeably caused customers to purchase eCW's EHR products. These misrepresentations also foreseeably caused the purchasers to attest to compliance with Meaningful Use requirements when they were not in compliance with those requirements, and

31

foreseeably caused the purchasers to submit claims to the Federal Government for EHR incentive payments to which they were not entitled. In this manner, eCW knowingly caused false claims, and false statements material to false claims, to be submitted to the Government.

117.    Despite knowing about the flaws in its EHR system, and without correcting them, eCW has continued to promote its EHR system while concealing these flaws from potential customers. These promotional efforts have caused the purchase of eCW's EHR system by providers in Vermont and throughout the country, and caused providers to submit claims for federal incentive payments to which they are not entitled.

118.    eCW's sales of its EHR products with the flaws described in this Complaint system have caused federal monies to be paid for eCW's EHR products that are defective and do not meet fundamental requirements for performance as defined by the Meaningful Use criteria. These standards for performance are core requirements for any EHR system.

119.    Every claim for payment submitted to the Government for an EHR product that is defective and/or does not meet Meaningful Use requirements is a false or fraudulent claim in violation of the FCA.

## G.    eCW Has Also Knowingly Caused The Submission Of False Or Fraudulent Claims For Payments To The Government Under The Medicare Electronic Prescribing Incentive Program

120.    Under the Medicare Electronic Prescribing Incentive program, which began in January 2009, CMS began offering eligible providers incentive payments for their use of an electronic prescribing (ePrescribing) system to prescribe medications for Medicare patients. Under the law, for 2009 and 2010, ePrescribing incentive amounts were 2 percent of a provider's total estimated allowed charges for covered professional services during the reporting period (one calendar year). The incentive amount was reduced to 1 percent in 2011 and 2012, and 0.5

32

percent in 2013 (the last year of the program).

121.    As defined by CMS, a qualified electronic prescribing system utilized with intent to participate in the ePrescribing Incentive Program must "Generate a complete active medication list incorporating electronic data received from applicable pharmacies and pharmacy benefit managers (PBMs), if available," and be able to "select medications, print prescriptions, electronically transmit prescriptions, and conduct all alerts."  76 Fed. Reg. 54953, 54954 (September 6, 2011).  CMS defines "alerts" as, "Written or acoustic signals to warn prescriber of possible undesirable or unsafe situations, including potentially inappropriate dose or route of administration of a drug, drug-drug interactions, allergy concerns, or warnings and cautions." *Id.*

122.    eCW falsely represents that its EHR software meets the requirements for the Medicare Electronic Prescribing Incentive program. *See, e.g,* "Medicare E-Prescribing Incentive Guide October 2011 Update" (eClinicalWorks, 2011), at p. 6 (stating that subscribing to eCW's EHR system "should permit providers to meet the Medicare definition of a Qualified Electronic Prescribing System" for purposes of receiving Medicare electronic prescribing incentive payments).

123.    With its ongoing systemic flaws and inadequate protections, eCW's system falls far short of the ePrescribing standards.   Every claim presented to the Government for payment of an ePrescribing Incentive payment as a result of false or fraudulent representations by eCW constitutes a false or fraudulent claim under the FCA.

**False Claims Act**

**31 U.S.C. §§ 3729(a)(1)(A)-(B)**

124.    Relator realleges and incorporates by reference the allegations contained in

33

paragraphs 1 through 123 above as though fully set forth herein.

125.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

126.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

127.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

128.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by several separate entities. Relator does not have access to the records of all such false or fraudulent statements, records or claims.

129.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

130.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation arising from Defendant's unlawful conduct alleged herein.

## PRAYER

WHEREFORE, *qui tam* Plaintiff-Relator Brendan Delaney prays for judgment against the Defendant as follows:

34

1. That Defendant cease and desist from violating 31 U.S.C. § 3729 *et seq*.

2. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relator recover such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: May 1, 2015

DOWNS RACHLIN MARTIN PLLC

By: _Eric Poehl_

Eric Poehlmann
Downs Rachlin Martin PLLC
199 Main Street
Burlington, VT 05402-0190
Tel: 802-863-2375
Fax: 802-862-7512

PHILLIPS & COHEN LLP

By:  Colette G. Matzzie
Phillips & Cohen LLP
2000 Massachusetts Ave. NW

35

Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Larry P. Zoglin
Ari Yampolsky
Phillips & Cohen LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001


Attorneys for Plaintiff-Relator Brendan Delaney